2010 ME 56

**Paul F. RAINEY et al.**

v.

**Edward A. LANGEN et al.**

Supreme Judicial Court of Maine.

Argued: Feb. 9, 2010.
Decided: June 29, 2010.

Daniel G. Kagan, Esq. (orally), Berman & Simmons, Lewiston, ME, for Paul F. and Patricia A. Rainey.

James M. Bowie, Esq. (orally), Hillary J. Bouchard, Esq., Thompson & Bowie, LLP, Portland, ME, for Domino's Pizza, LLC.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1]  Paul F. and Patricia A. Rainey appeal from a partial summary judgment entered in the Superior Court (Cumberland County, *Warren, J.*) in favor of Domino's Pizza, LLC on the Raineys' claims for vicarious liability and negligence. The Raineys argue that the summary judgment record compels a conclusion that Domino's Pizza is vicariously liable for in-juries Paul sustained in a motor vehicle accident. Alternatively, the Raineys contend that disputed issues of material fact remain regarding Domino's Pizza's vicarious liability. We affirm.

## I.  BACKGROUND

[¶ 2]  On July 25, 2004, while riding his motorcycle, Paul was seriously injured in a collision with a car driven by Edward A. Langen, who was delivering pizza for his employer, TDBO, Inc.[1] TDBO is a Domino's Pizza franchisee that operates a Domino's Pizza franchise store in Gorham.

[¶ 3]  At the time of the accident, the relationship between TDBO and Domino's Pizza was governed pursuant to a "Standard Franchise Agreement" (Agreement) and "Manager's Reference Guide" (Guide). The following details of this contractual relationship are undisputed: (1) other than Domino's Pizza's right to receive royalties (5.5% of TDBO sales), there is no profit-sharing or loss-sharing and Domino's Pizza owns no interest in TDBO; (2) the entities share no common officers, directors, employees, or owners; (3) TDBO owns or leases its own equipment, and may "purchase items meeting [Domino's Pizza's] specifications from any source"; (4) TDBO maintains its own bank account, possesses its own tax identification number, business license, and operating permit, files separate tax returns, and pays the taxes it incurs as a result of its business operations; (5) TDBO establishes the prices for the products it sells and the wages it pays its employees; (6) Domino's Pizza does not specify or control the scheduling of TDBO's employees, except that it requires at least one qualified delivery driver to be present during store hours; and (7) other than mandating certain standards pursuant to the Agreement and Guide, Domino's

---

1.  For purposes of summary judgment, Langen's negligence is presumed.

Pizza does not hire, fire, train, pay, supervise, or discipline TDBO's employees.

[¶ 4] Although the Raineys and Domino's Pizza disagree as to the significance of many of the contractual provisions governing the franchise relationship, viewed in the light most favorable to the Raineys, as the nonprevailing party, *see Roop v. City of Belfast*, 2007 ME 32, ¶ 6, 915 A.2d 966, 968, the record references in the parties' statements of material facts reveal the following about the Agreement and Guide.

[¶ 5] The Agreement creates a uniform system of standards to ensure that each franchisee offers products and services that meet minimum criteria. Among the topics covered by the Agreement are food preparation, store location, royalty fees, training, advertising, recordkeeping, and insurance.

[¶ 6] Specifically, the Agreement provides that TDBO's franchise store "shall at all times be under the direct, on-premises supervision" of TDBO. TDBO is also "solely responsible for training [its] employees to safely and properly perform" their duties, and may not "employ any person who fails or refuses to complete [TDBO's] training programs or is unqualified to perform his or her duties in accordance with the requirements established for the operation of a Domino's Pizza Store." TDBO must "fully comply with all specifications, standards and operating procedures and rules from time to time prescribed for the operation of a Domino's Pizza Store," including safety, food preparation, and the "methods and procedures relating to receiving, preparing and delivering customer orders." Domino's Pizza retains the right to "conduct reasonable inspections" of franchise stores, and reserves the power to terminate a franchise for certain violations, including failure to comply with provisions contained in the Agreement.

[¶ 7] Regarding the franchise relationship, the Agreement disavows the existence of any agency relationship, and states that "[t]he parties to this Agreement are independent contractors and no training, assistance or supervision which [Domino's Pizza] may give or offer to [TDBO] shall be deemed to negate such independence or create a legal duty on [Domino's Pizza's] part."

[¶ 8] By reference, the Agreement incorporates the Guide, a manual containing most of the detailed operational requirements. The Guide must be readily available in each franchise store, and franchisees are required to adhere to section 2 (Product), section 12 (Standards), and section 15 (Image and Identity). Other sections in the Guide are for "informational purposes only," and a franchisee is not required to "adopt or use any policy or practice contained in these sections." The Guide further provides that "franchisees are solely responsible for the terms and conditions of employment applicable to their team members."

[¶ 9] Section 12 of the Guide sets forth rules applicable to delivery drivers and delivery vehicles, including: (1) age limits for hiring drivers; (2) minimum motor vehicle record requirements; (3) seat belt usage requirements; (4) radar detector and cell phone usage limitations; and (5) delivery vehicle inspection and maintenance standards. Domino's Pizza also retains the right to "prescribe from time to time the boundaries beyond which the [franchisee] may not offer delivery service," and requires that franchisees "strictly comply with all laws, regulations and rules of the road and due care and caution in the operation of delivery vehicles." As part of its hiring process, TDBO required Langen to complete a "Safe Delivery Program—Review Exam A" and a "Safe Delivery Pledge," forms that were provided

by Domino's Pizza to TDBO for informational purposes.

[¶ 10] In October 2007, the Raineys filed a six-count complaint in the Superior Court against Langen, TDBO, and Domino's Pizza, alleging negligence, vicarious liability, and loss of consortium. Domino's Pizza moved for a partial summary judgment in April 2008, seeking judgment in its favor on the negligence and vicarious liability counts of the Raineys' complaint. The Raineys opposed the motion, arguing that disputed issues of fact existed as to whether Domino's Pizza exerted sufficient control over TDBO's operations to subject itself to vicarious liability for Langen's negligence.

[¶ 11] On January 5, 2009, the court granted Domino's Pizza's motion, reasoning that "although [the Raineys] may have raised disputed issues for trial as to the extent of actual or potential control exerted by [Domino's Pizza] over its franchisee TDBO," the Raineys failed to raise a disputed issue as to "whether [Domino's Pizza] (as opposed to TDBO) controlled or had the right to control Edward Langen." In reaching its decision, the court recognized a jurisdictional split regarding "whether franchisors can be subjected to vicarious liability for the actions of franchisee employees," but found the authority submitted by Domino's Pizza to be more persuasive.[2]

[¶ 12] On July 10, 2009, the court granted the Raineys' unopposed motion to certify the partial summary judgment as a final judgment pursuant to M.R. Civ. P. 54(b)(1).[3] The Raineys then brought this appeal.

## II. DISCUSSION

[¶ 13] We are called upon in this case to determine the circumstances in which a franchisor may be held vicariously liable for the negligent acts of an employee of its franchisee. Although the issue of franchisor vicarious liability is one of first impression in Maine, we are not without guidance. Principles of vicarious liability are well established in our state, and provide a suitable framework for analyzing the franchisor-franchisee relationship.

[¶ 14] Stated generally, vicarious liability is "liability that a supervisory party (such as an employer) bears for the actionable conduct of a subordinate or associate (such as an employee) because of the relationship between the two parties." *York Ins. Co. of Me. v. Bowden*, 2004 ME 112, ¶ 4 n. 2, 855 A.2d 1157, 1158 (quoting Black's Law Dictionary 927 (7th ed. 1999)). Because an employer may be held vicariously liable for the negligence of its employees, but is not usually responsible for the negligence of independent contractors, *see Legassie v. Bangor Publ'g Co.*, 1999 ME 180, ¶ 5, 741 A.2d 442, 444, a prerequisite to imposing vicarious liability is the existence of an employer-employee relationship.

[¶ 15] In distinguishing between employees and independent contractors,

---

**2.** The court also granted summary judgment in favor of Domino's Pizza on the negligence claim. The Raineys do not contest the court's judgment with respect to the negligence claim on appeal.

**3.** The Raineys failed to include a copy of the order in the appendix, as required by M.R.App. P. 8. Although we discern no abuse of discretion in the Superior Court's entry of the partial final judgment, *see Dexter v. Town of Norway*, 1998 ME 195, ¶ 6, 715 A.2d 169, 171, we reiterate that, "[i]n an appeal taken from a Rule 54(b)(1) order, the appendix must include the portions of the record setting out the factual and legal bases for the granting of the order," *Boothby v. Grindle*, 2009 ME 132, ¶ 10 n. 3, 985 A.2d 1147, 1150.

we consider several factors,[4] the most important of which is the "right to control." *Id.* ¶ 6, 741 A.2d at 444; *Taylor v. Kennedy*, 1998 ME 234, ¶ 8, 719 A.2d 525, 527–28; *Peerless Ins. Co. v. Hannon*, 582 A.2d 253, 255 (Me.1990). The right to control "includes the rights both to employ and to discharge subordinates and the power to control and direct the details of the work." *Legassie*, 1999 ME 180, ¶ 6, 741 A.2d at 444. On this point, we have emphasized that the right to control the "details of the performance," which is indicative of an employer-employee relationship, "must be distinguished from the right to control the result to be obtained, usually found in independent contractor relationships." *Id.* (quotation marks omitted).

▮ [¶ 16] These principles apply with equal force in the franchisor-franchisee context. With near uniformity, courts apply some version of the "right to control" test in determining whether the imposition of vicarious liability on a franchisor is appropriate. *See Miller v. McDonald's Corp.*, 150 Or.App. 274, 945 P.2d 1107, 1110 (1997) ("The relationship between two business entities is not precisely an employment relationship, but ... most if not all other courts that have considered the issue ... [apply] the right to control test for vicarious liability in that context as well."); *Kerl v. Dennis Rasmussen, Inc.*, 2004 WI 86, ¶ 31, 273 Wis.2d 106, 682 N.W.2d 328, 337 ("Most courts that have addressed the issue of franchisor vicarious liability ... have adapted the traditional master/servant 'control or right of control' test to determine whether the relationship between the franchisor and franchisee should give rise to vicarious liability."). *See generally* Herbert B. Chermside, Jr., Annotation, *Vicarious Liability of Private Franchisor*, 81 A.L.R.3d 764 (1977 & Supp.2006) (collecting cases). In evaluating the requisite level of control, courts commonly distinguish between control over a franchisee's day-to-day operations and "controls designed primarily to insure 'uniformity and the standardization of products and services.'" Joseph H. King, Jr., *Limiting the Vicarious Liability of Franchisors for the Torts of Their Franchisees*, 62 Wash. & Lee L.Rev. 417, 431–32 (2005) (quoting *Little v. Howard Johnson Co.*, 183 Mich.App. 675, 455 N.W.2d 390, 394 (1990)). This distinction is consistent with our emphasis on the "power to control and direct the details of the work," rather than the "result to be obtained." *Legassie*, 1999 ME 180, ¶ 6, 741 A.2d at 444.

▮ [¶ 17] This distinction takes on an increased level of significance in claims of franchisor vicarious liability because of certain characteristics unique to the franchisor-franchisee relationship. "Generally, franchising is a method of expanding a business by licensing independent busi-

---

4. In determining whether an independent contractor relationship exists, we have enumerated the following eight factors to be considered and weighed:

    (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price;

    (2) independent nature of the business or his distinct calling;

    (3) his employment of assistants with the right to supervise their activities;

    (4) his obligation to furnish necessary tools, supplies, and materials;

    (5) his right to control the progress of the work except as to final results;

    (6) the time for which the workman is employed;

    (7) the method of payment, whether by time or by job;

    (8) whether the work is part of the regular business of the employer.

*Legassie v. Bangor Publ'g Co.*, 1999 ME 180, ¶¶ 6 n. 1, 8–11, 741 A.2d 442, 444–46 (applying the eight factor test originally set forth in *Murray's Case*, 130 Me. 181, 186, 154 A. 352, 354 (1931)).

nessmen to sell the franchisor's product or service or to follow a format and trade style created by the franchisor using the franchisor's trade marks and trade names." 1 Gladys Glickman, *Franchising* § 2.01 (2006). Indeed, at its core, the franchise system involves the licensing of intellectual property, usually in the form of the franchisor's trademark. *Id.* § 3A.02. The franchisor-franchisee relationship is thus heavily influenced by rules of trademark law, primarily as set forth in the Lanham Act. *See* 15 U.S.C. §§ 1051–1129 (LEXIS through June 9, 2010 legislation).

[¶ 18] Among other requirements, "the Lanham Act places an affirmative duty upon a licensor of a registered trademark to take reasonable measures to detect and prevent misleading uses of his mark by his licensees or suffer cancellation of his federal registration." *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 366 (2d Cir.1959). This duty "derives from the Lanham Act's abandonment provisions, which specify that a registrant's mark may be canceled if the registrant fails to control its licensees' use of the licensed mark." *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.,* 967 F.2d 1516, 1519 (11th Cir.1992). Accordingly, in order to avoid non-compliance with the Lanham Act, a trademark licensor has an obligation to maintain adequate control over the use of its mark. *See* 2 Gilson on Trademarks § 6.04 (LEXIS 2010) ("Control over the nature and quality of the licensee's goods or services is the touchstone of a valid trademark license.").

[¶ 19] Notwithstanding this resemblance to the vicarious liability "right to control" test, the control mandated by the Lanham Act was not intended to "saddle [a] licensor with the responsibilities under state law of a principal for his agent." *Oberlin v. Marlin Am. Corp.,* 596 F.2d 1322, 1327 (7th Cir.1979). As a result, it is necessary to evaluate the franchise relationship in light of the franchisor's duty to police its trademark. As one commenter has noted, broadly extending vicarious liability could improperly penalize a franchisor for exercising the degree of control necessary to protect the integrity of its trademark. *See* Michael R. Flynn, Note, *The Law of Franchisor Liability: A Critique,* 1993 Colum. Bus. L.Rev. 89, 99 (1993).

[¶ 20] Mindful of this concern, a number of courts have adopted a modified version of the vicarious liability "right to control" test. Representative of this approach is the Wisconsin Supreme Court's decision in *Kerl,* 2004 WI 86, 273 Wis.2d 106, 682 N.W.2d 328. Reasoning that the Lanham Act-related obligations incumbent upon franchisors weighed in favor of narrowing the focus of the traditional "right to control" test, the court in Kerl held that "a franchisor may be subject to vicarious liability for the tortious conduct of its franchisee only if the franchisor had control or a right of control over the daily operation of the specific aspect of the franchisee's business that is alleged to have caused the harm." *Id.* ¶ 50, 682 N.W.2d at 342. Often referred to as the "instrumentality rule," this approach has been embraced in several other jurisdictions. *See, e.g., Papa John's Int'l, Inc. v. McCoy,* 244 S.W.3d 44, 55 (Ky.2008); *VanDeMark v. McDonald's Corp.,* 153 N.H. 753, 904 A.2d 627, 634–36 (2006); *see also Hong Wu v. Dunkin' Donuts, Inc.,* 105 F.Supp.2d 83, 87–88 (E.D.N.Y. 2000).

[¶ 21] Other courts apply the traditional "right to control" test in analyzing franchisor vicarious liability. *See, e.g., Drexel v. Union Prescription Ctrs., Inc.,* 582 F.2d 781, 785–90 (3d Cir.1978); *Butler v. McDonald's Corp.,* 110 F.Supp.2d 62, 66–68 (D.R.I.2000); *Font v. Stanley*

*Steemer Int'l, Inc.*, 849 So.2d 1214, 1216–19 (Fla.Dist.Ct.App.2003); *Viado v. Domino's Pizza, LLC*, 230 Or.App. 531, 217 P.3d 199, 208–09 (2009). This approach recognizes that, while the vicarious liability and Lanham Act analyses involve an element of "control," the inquiries are distinct. To protect its trademark, a franchisor "must retain sufficient control over the licensees' dealings in the *end product* to insure that they will apply the mark to either the same product or to one of substantially the same quality with which the public in the past has associated the product." 1 Gladys Glickman, *Franchising* § 3A.02[4][a] (emphasis added). Conversely, the vicarious liability "right to control" test focuses on a franchisor's control over a franchisee's performance of its day-to-day operations. *See Legassie*, 1999 ME 180, ¶ 6, 741 A.2d at 444.

[¶ 22] We conclude that the traditional approach strikes an appropriate balance and, for that reason, decline to adopt the instrumentality rule. The traditional test allows a franchisor to regulate the uniformity and the standardization of products and services without risking the imposition of vicarious liability. *See Oberlin*, 596 F.2d at 1327 ("The duty [imposed by the Lanham Act] does not give a licensor control over the day-to-day operations of a licensee beyond that necessary to ensure uniform quality of the product or service in question."); *L.A. Gear, Inc. v. E.S. Originals, Inc.*, 859 F.Supp. 1294, 1299 (C.D.Cal.1994) (stating that "trademark license agreements do not in and of themselves create an agency relationship"). If a franchisor takes further measures to reserve control over a franchisee's performance of its day-to-day operations, however, the franchisor is no longer merely protecting its mark, and imposing vicarious liability may be appropriate. *See Drexel*, 582 F.2d at 786 ("[T]he mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship."); *cf. William L. Killion, *Franchisor Vicarious Liability—The Proverbial Assault on the Citadel*, 24 Franchise L.J. 162, 166–67 (2005) (arguing that the instrumentality rule represents a merging of vicarious and direct liability because " '[c]ontrol of the instrumentality' becomes another way of saying that the franchisor assumed a duty").

[¶ 23] We now turn to the instant case. We review the Superior Court's grant of summary judgment de novo, considering "the evidence in the light most favorable to the nonprevailing party to determine whether the parties' statements of material facts and the record evidence to which the statements refer demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733, 738 (quotation marks omitted). "A material fact is one having the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "A genuine issue exists when sufficient evidence supports a factual contest to require a factfinder to choose between competing versions of the truth at trial." *Id.*

[¶ 24] To focus the discussion, a preliminary issue warrants explanation. In granting Domino's Pizza's summary judgment motion, the Superior Court considered the relevant issue to be whether Domino's Pizza "controlled or had the right to control Edward Langen." Although the Raineys seek to hold Domino's Pizza vicariously liable for the negligent acts of Langen, the proper focus of the analysis is on the relationship between Domino's Pizza and TDBO. If TDBO is an

agent-employee of Domino's Pizza, then Langen, as an employee of TDBO, is also an agent-employee of Domino's Pizza. *See* Restatement (Third) of Agency § 3.15 cmt. d (2006) ("As between a principal and third parties, it is immaterial that an action was taken by a subagent as opposed to an agent directly appointed by the principal."). We are, of course, free to affirm a summary judgment for reasons different from those upon which the Superior Court relied. *See Fitzgerald v. Hutchins,* 2009 ME 115, ¶ 17, 983 A.2d 382, 388.

■ [¶ 25]  Based on our review of the Agreement and Guide, we conclude that, although the quality control requirements and minimum operational standards are numerous, these controls fall short of reserving control over the performance of TDBO's day-to-day operations. We recognize that the Agreement itself states that Domino's Pizza and TDBO are "independent contractors." This declaration is relevant, although the label used by the parties to characterize their relationship is not controlling. *See Campbell v. Wash. Cnty. Technical Coll.,* 219 F.3d 3, 7 (1st Cir.2000) ("Maine courts follow the oft-stated rule that the legal relationship between the parties does not turn on the label the parties themselves attach."). Again, the ultimate determination turns on an analysis of the *Murray's Case* factors, particularly the degree of control reserved by Domino's Pizza, as evidenced by the terms of the Agreement and Guide.

[¶ 26]  The Agreement specifies that the supervision and operation of the Gorham franchise store is TDBO's "sole responsibility" and that "it is not [Domino's Pizza's] responsibility or duty" to implement employee training programs. Moreover, though bound by certain mandated minimum requirements, TDBO: (1) determines the wages it pays its employees; (2) determines the scheduling of its employ-

ees; and (3) makes all day-to-day decisions concerning hiring, firing, training, supervising, and disciplining its employees. Although Domino's Pizza retains the right to conduct inspections and terminate the franchise relationship, such conditions do not constitute sufficient control to impose vicarious liability. *See Schlotzsky's, Inc. v. Hyde,* 245 Ga.App. 888, 538 S.E.2d 561, 563 (2000); *Little,* 455 N.W.2d at 394. With respect to the Guide, although the Raineys repeatedly reference sections 6 and 7, these sections specifically state that they are for "informational purposes only." In deciding whether the terms of a franchise agreement give rise to vicarious liability, "courts typically draw distinctions between *recommendations* and *requirements* " and are reluctant to impose liability based on mere suggestions. *Hong Wu,* 105 F.Supp.2d at 89. The remaining mandatory sections of the Guide, while comprehensive and detailed, do not dictate the precise methods by which TDBO is required to carry out its daily responsibilities.

[¶ 27]  Several other factors are inconsistent with an employer-employee relationship: (1) franchising, by its nature, typically involves the licensing of "independent businessmen to sell the franchisor's product or service," 1 Gladys Glickman, *Franchising* § 2.01; (2) TDBO is responsible for purchasing or leasing its own equipment and supplies; and (3) Domino's Pizza does not compensate TDBO as its employee; rather, TDBO is paid by its customers and provides Domino's Pizza with a royalty fee. *See Legassie,* 1999 ME 180, ¶ 6 n. 1, 741 A.2d at 444 (listing factors 2, 4, and 7).

[¶ 28]  In the end, the quality, marketing, and operational standards present in the Agreement and Guide do not establish the supervisory control or right of control necessary to impose vicarious liability. *See Viado,* 217 P.3d at 209 (finding, based

on a comparable "Standard Franchise Agreement," and "Manager's Reference Guide," that "Domino's did not retain the right to control [the franchisee] in the way that an employer controls an employee"). Because we conclude that, as a matter of law, Domino's Pizza did not retain sufficient control over TDBO so as to subject itself to vicarious liability, the court did not err in granting Domino's Pizza's motion for partial summary judgment.

The entry is:

Judgment affirmed.